Filed 5/17/21  In re M.P. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | |
| | D078246 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519892) |
| v. | |
| M.P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marian Gaston, Judge.  Affirmed.

Linda B. Puertas, under appointment by the Court of Appeal, for Defendant and Appellant M.P. (Mother).

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

Mother appeals from a judgment of the juvenile court terminating her parental rights as to minor child, M.P. Mother asserts the juvenile court erred by concluding the beneficial parent-child bond exception set forth in Welfare and Institutions Code[1] section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude the termination of her parental rights. We find no error and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

*Juvenile Dependency Petition*

M.P. first came to the attention of the San Diego County Health and Human Services Agency (the Agency) in September 2019, when she was approximately 18 months old. The Agency received a report indicating Mother suffered severe complications from a surgical procedure and was in a coma, unable to care for M.P. The reporting party indicated M.P.'s father (Father) was also unable to care for M.P. due to mental health concerns and prolonged substance abuse. Father had several outbursts at the hospital and was seen laughing and talking to himself.

The Agency spoke with a maternal great aunt at the hospital. She indicated Mother had recently separated from Father due to his drug use. She said Father was unemployed, did not have stable housing, and was diagnosed with Bipolar Disorder and Schizophrenia. While at the hospital, Father had told her demons were telling him what to do and he saw angels floating over Mother's bed.

Father admitted he used methamphetamine and marijuana regularly but denied the allegations regarding mental illness. Father said he asked M.P.'s godparents to care for her while he got himself "right" and got a job.

---

[1] All further statutory references are to the Welfare and Institutions Code.

Mother came out of the coma in early October but remained in the hospital with a tracheal tube and severe brain damage. At a Child and Family Team (CFT) meeting on October 5, 2018, Father agreed to move M.P. into the home of the maternal aunt, Alyssa C., until he could provide adequate care for her himself.

Father also agreed to meet with a substance abuse specialist and attend regular Narcotics Anonymous (NA) meetings. Father called the substance abuse specialist but avoided meeting in person and failed to complete an initial assessment. He also failed to produce records of attendance at NA meetings.

During a supervised visit on October 21, Father stated he had "something" for M.P. and took her out to his vehicle. Alyssa followed Father outside and observed him placing M.P. in the backseat of his car and buckling her in, without a proper child's car seat. Father got into the car as if he planned to drive away with M.P. Alyssa opened the rear door and removed M.P. from the car. Father did not make any attempt to explain the incident.

The Agency filed a juvenile dependency petition on behalf of M.P. the following week. In the associated detention report, the Agency noted Father had not addressed his substance abuse issues and remained unable to care for M.P., but that there were growing concerns that he would try to remove her from Alyssa's care. Alyssa stated she would not continue to care for M.P. without intervention of the juvenile court. The juvenile court found the Agency made a prima facie showing on the petition and detained M.P. with Alyssa.

*Six-Month Review Period*

By November, Mother was able to speak with the Agency social worker, although her speech was slow and labored. She denied having any

knowledge about Father's drug use. She acknowledged Father "hears things" and indicated he had never sought treatment or taken medication to address his mental health. Mother was unable to walk, depended on others for her basic needs, and was not sure what the next steps were for her recovery. The hospital social worker said Mother was making progress but would not be released from the hospital until they could establish a safe discharge plan. She said Mother was often tearful and worried M.P. would forget her, but also had to be reminded regularly that Alyssa was caring for M.P.

Mother's relatives brought M.P. to visit her in the hospital. M.P. was initially upset by all of the tubes and machines but began to visit more often after the tubes were removed. Alyssa reported M.P. had some difficulty being separated from Mother but was beginning to adjust to her home and develop new routines.

Father had several supervised visits each week but regularly missed visits or stayed for only 30 minutes. Alyssa initially supervised Father's visits but they were later moved to the child welfare services office due to safety concerns.

Mother was discharged from the hospital in December. She was diagnosed with impaired short-term memory, impaired cognition, emotional lability, and decreased mobility. She continued to be dependent on others and required extensive additional therapy. Mother's relatives indicated she was "totally different" and spent a lot of time crying. In addition, Mother no longer remembered her plans to divorce Father, who, himself, had not made efforts to check in on M.P. and now seemed preoccupied with Mother.

Mother moved in with family members as she was unable to care for herself. The Agency allowed M.P. and Mother to have an extended holiday visit at the relatives' home. Mother's sister reported Mother stayed in bed

much of the time and refused to care for M.P. She said Mother continued to call Father. At one point, Father arrived at the home and Mother wanted to leave with him, despite M.P. being there. The caregivers told Mother she would not get M.P. back if she left with Father and Mother said she did not care.

On January 22, 2019, the juvenile court made true findings on the petition. The court continued the placement with Alyssa and ordered that the Agency provide services to Mother.

Mother remained in active recovery and still had a number of challenges, including being unable to speak above a whisper and continuing to lose weight and muscle mass. She continued to live with relatives, and M.P. continued to live with Alyssa but had regular overnight visits in the relatives' home with Mother. Father had minimal contact with the Agency and M.P. over the following several months. He was arrested in June for possession of a controlled substance and burglary tools, among other charges.

In a status review report submitted before the 6-month review hearing on July 23, 2019, the Agency noted M.P. was sometimes aggressive with Mother. She pushed Mother, causing her to fall, and hit Mother during diaper changes. The Agency indicated it would like to see Mother taking more of a parental role during the visits and recommended in home support services. The Agency also raised concerns that Mother continued to pursue a relationship with Father, who had not yet addressed his mental health or substance abuse issues. The Agency noted Mother had complied with her primary goal of focusing on her health and attending all medical appointments, but indicated it remained unclear whether Mother would be able to safely parent M.P.

A court appointed special advocate (CASA) indicated M.P. enjoyed playing with the family members during visits, Mother had "slowly been getting more interactive with M.P.," and M.P. missed Mother after the visits. She noted M.P. had demonstrated some aggressive behaviors, but indicated she was nevertheless thriving in her placement with Alyssa.

At the six-month review hearing in July 2019, the Agency recommended that M.P. remain in her current placement with Alyssa and that the family receive an additional six months of services. The juvenile court adopted the Agency's recommendation.[2] In addition, the court granted the Agency discretion to allow Mother unsupervised and overnight visits.

*12-month Review Period*

In the following months, Mother continued to struggle interacting with M.P. In August, Mother's cousin reported Mother ignored M.P. when she asked to go outside during a visit. The cousin encouraged Mother to help M.P. get her shoes on to go outside and Mother ignored the cousin as well. M.P. then fell and hit her chin on the floor. She ran to Mother for comfort, but Mother ignored her, and she went to the cousin instead. The cousin told Mother she should get off her phone to spend time with her daughter, and Mother responded by yelling expletives, waving her middle fingers, and throwing her phone at the cousin.

Mother then indicated she planned to leave, so the cousin called Alyssa to pick up M.P. Mother became upset, said M.P. was leaving with her, and grabbed M.P. by the wrist. The cousin told Mother to let M.P. go before she hurt her, and Mother let go but then picked M.P. up. Mother was crying

---

[2]    It is unclear from the orders whether the court ordered reunification services for both parents or just Mother. Regardless, Father did not participate in the case, and thus did not receive services, and is not a party to this appeal.

6

hysterically, and M.P. began to cry as well. The family members had to forcibly remove M.P. from Mother. Mother then began swinging her fists at the cousin and the cousin pushed her away, causing Mother to fall. The cousin left the house and returned M.P. to Alyssa. M.P. was able to verbalize that the cousin and Mother were fighting, and the cousin expressed concern the incident would add to the anger and aggression M.P. was already experiencing.

Mother underwent further testing in September 2019 and the doctor indicated her brain had shrunk due to a lack of oxygen and there was nothing more they could do to improve her condition. The associated report from the physician indicated Mother suffered from dementia related to cerebral anoxia and was not capable of making meaningful decisions. Around the same time, Mother was released from physical therapy because she refused to do the recommended exercises at home.

By October, Mother had moved out of the family home due to conflict between her and the relatives and was residing in a hotel. Mother gave the Agency social worker Father's mailing address as her own and the family indicated Mother and Father were staying together. Mother's visits became less frequent as she was no longer in the home with relatives. When Mother did visit with M.P., she did not play with her or meet her needs, and often ignored her altogether.

The Agency referred Mother to in home services through Intensive Family Preservation Program (IFPP). A social worker from IFPP completed an assessment. Mother stated she wanted to care for M.P. but could not explain how she would be able to carry out basic tasks like cooking or bathing M.P. Mother said she was still in contact with Father and thought it would help the dependency case if she got back together with him. IFPP ultimately

7

determined Mother was not appropriate for services as it did not appear reunification was possible in the near term, even with the help of IFPP.

In a status report dated October 22, 2019, the Agency said it could not recommend returning M.P. to Mother's care. The Agency explained Mother did not have the physical skills or mental capacity to provide for M.P. on a daily basis. In addition, Mother continued to pursue a relationship with Father and suggested she would rely on him to help care for M.P., but that was not a viable option as Father had not addressed his substance abuse or made himself available to the Agency.

As Mother was no longer living with relatives, her overnight visits were suspended, and she began visiting with M.P. twice a week at restaurants or a relative's home. At one of the restaurant visits, Mother forgot how to walk while in the parking lot and a stranger ended up carrying her into the restaurant. In the following months, Mother missed a number of visits and continued to pay little attention to M.P. during visits she did attend.

In November, the San Diego Police Department conducted a welfare check after Father left Mother alone outside a welfare office after an argument. Father eventually returned and was arrested on an outstanding warrant. The officer called Mother's sister and she came to take Mother back to the family home. When she arrived, Mother had the keys to the car she and Father had reportedly been living in and refused to let go of them. The aunt agreed to drive the car home but asked the police officers to search it first. The police found "a knife and a crystal meth pipe" in the car.

In an addendum report dated January 10, 2020, the Agency recommended the juvenile court terminate reunification services. After a hearing that same day, the juvenile court accepted the Agency's

recommendation, terminated services for Mother and Father, and set a section 366.26 permanency hearing.

*Section 366.26 Hearing*

Mother had sporadic visits with M.P. over the next two months. On February 23, Mother moved out of her relatives' home once again. Mother said she would resume in-person visits with M.P. once she had a permanent address and, in the meantime, would continue with phone and video visits. The visits generally lasted between two and 30 minutes. M.P. often said she did not want to participate, and that she was "bored," "frustrated," and "[did] not want to talk." At times, she would set the phone down and walk away, or would end the call early herself.

An Agency social worker observed a video visit in April. During the call, Mother continued to call M.P. by her first and middle name despite M.P. asking her not to and becoming visibly upset. Eventually, M.P. laid on the ground and refused to engage further with Mother.

Around the same time, the social worker conducted a "Permanency House" activity with M.P. She told M.P. they were going to make her "forever" home and asked who she would want to live with if she could live with anyone forever. M.P. stated she wanted to live with Alyssa and no one else. The social worker asked if she wanted anyone to visit and M.P. responded, "Elsa" and "Moana." The social worker asked if Mother and Father could visit and M.P. said "yes". She later stated, "I want everyone to visit."

In a section 366.26 report dated May 5, 2020, the Agency concluded M.P. was both specifically and generally adoptable. Her relative caretaker Alyssa wanted to adopt her and expressed she would prefer adoption to guardianship. In addition, M.P. was happy, healthy, and meeting all

9

developmental milestones. The Agency noted Mother did maintain visitation with M.P. throughout the dependency, but the consistency of the visits had varied. In addition, Mother was often disengaged during the visits and relied on the help of family members to care for M.P. Father continued to struggle with substance abuse and Mother continued to pursue a relationship with him. Accordingly, the Agency concluded the benefits of adoption outweighed any possible detriment caused by the severance of Mother's and Father's parental rights.

The permanency hearing was continued several times and Mother and Father continued to have video visits with M.P. in the meantime. The Agency received reports indicating Mother was living in a van with Father and had refused a hotel voucher because Father could not live with her in the hotel. M.P. often said she did not want to talk to Mother and covered her face or walked away during video visits. Alyssa tried to convince M.P. to participate and at times offered her rewards. During a visit in October, Mother appeared to be talking to Father and M.P. said, "Mom, you are not watching me," and then stopped interacting with Mother. M.P. was often upset after the visits; she acted out, had trouble sleeping, and had increased restroom accidents.

Despite these issues, M.P. continued to thrive in Alyssa's care. The Agency continued to recommend the juvenile court terminate Mother's and Father's parental rights to allow for adoption.

At the section 366.26 hearing on October 29, 2020, Mother asserted the court should not terminate her parental rights because there was a significant parent-child bond that would substantially outweigh the benefits of adoption. Counsel argued Mother had done everything in her power to reunify, that M.P. still referred to her as "mommy", and that the issues with

visitation were largely the result of virtual visits. The juvenile court concluded Mother had visited regularly and it was clear she loved M.P., but the visits had never moved beyond short supervised visits and her relationship with M.P. was not a parent-child relationship under the law. The court therefore terminated Mother's and Father's parental rights and granted prospective adoptive parent status to Alyssa.

Mother appeals.

DISCUSSION

Mother asserts the juvenile court erred by terminating her parental rights because the court should have applied the beneficial parental relationship exception set forth in section 366.26, subdivision (c)(1)(B)(i).

1. *Applicable Law*

Once the juvenile court terminates reunification services in a dependency proceeding, the focus shifts from preserving the family to promoting the best interests of the child, including the child's interest in a stable, permanent placement. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 (*Fernando M.*); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).)

At this point, "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care." (*Fernando M.*, *supra*, 138 Cal.App.4th at p. 534.) Of those options, adoption is the permanent plan preferred by the Legislature, even though it requires termination of the natural parents' legal rights to the child. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 573.) Accordingly, if the juvenile court finds a caregiver is willing and able to adopt the child, the court must select adoption as the permanent plan unless it finds the

11

termination of parental rights would be detrimental to the child under one of the exceptions enumerated in the statute.  (§ 366.26, subd. (c)(1)(A) & (B)(i)-(vi); *Autumn H.*, at p. 573.)

Section 366.26, subdivision (c)(1)(B)(i) provides one such exception to the preference for adoption where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  Courts have interpreted this exception as requiring a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home."  (*Autumn H.*, *supra*, 27 Cal.App.4th at 575.)  "In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*Ibid.*)

A parent claiming the parental relationship exception has the burden of establishing it applies and must prove the child has a significant and positive emotional attachment to the parent.  (*In re T.S.* (2009) 175 Cal.App.4th 1031, 1039; *In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).)  Because a selection and implementation hearing occurs "after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

The parent asserting the exception will not meet his or her burden by showing the existence of a "friendly and loving relationship," an emotional bond with the child, or pleasant, even frequent, visits.  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 (*In re J.C.*); *C.F.*, *supra*, 193 Cal.App.4th at p. 555; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419; *In re L.S.* (2014) 230 Cal.App.4th 1183, 1200 ["To avoid termination of parental rights, it is not enough to show that a parent-child bond exists"].)  Rather, there must be a parental role in the child's life, resulting in a significant, positive emotional attachment from the child to parent that if severed would result in harm to the child.  (*C.F.*, at p. 555; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324; see also *In re J.C.*, at p. 529 [observing that interaction between a natural parent and child will always confer some incidental benefit to the child and for the exception to apply, " 'a parental relationship is necessary' " ].)

We apply a hybrid standard of review on appeal.  (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.)  We review the juvenile court's findings regarding the existence of a beneficial parental relationship for substantial evidence and review the juvenile court's determination as to whether there is a compelling reason for concluding the termination of parental rights would be detrimental to the child for an abuse of discretion.  (*Ibid.*; *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395; see also *Jasmine D., supra*, 78 Cal.App.4th at p. 1351 [practical difference between pure substantial evidence standard of review and hybrid standard of review is insignificant].)

*2.  Analysis*

Mother has not met her burden to establish a beneficial parent-child relationship with M.P. sufficient to outweigh the benefits of adoption.

M.P. was removed from Mother's care when she was approximately 18 months old.  Although it does appear Mother played a parental role in M.P.'s

13

life prior to the removal, the unfortunate reality is that Mother has been unable to do so since.

Mother visited M.P. throughout the dependency, but the consistency and length of the visits decreased over time. Early on, when M.P. was still living with relatives, she had frequent visits with M.P., including regular overnight visits. However, Mother was often disengaged during the visits and relied on the help of family members to care for M.P. The Agency indicated it would like to see Mother taking more of a parental role during the visits, but that did not occur, even when M.P. specifically sought out Mother for assistance or comfort.

When Mother began having conflict with her family members, visits transitioned to locations outside the home. Mother often missed visits and continued to pay little attention to M.P. during visits she did attend. By the time of the section 366.26 hearing, Mother did not appear to have stable housing and had been visiting with M.P. primarily over video for several months. M.P. often said she did not want to talk to Mother and covered her face or walked away during video visits, despite Alyssa offering her rewards for participating. She was not upset when the visits ended and, instead, often said she was done or asked to end the visits after only a short period of time. After the visits, M.P. acted out, had trouble sleeping, and had increased restroom accidents.

Meanwhile, M.P. was in a stable placement with a relative, Alyssa, and was thriving in that placement. At the time of the section 366.26 hearing, M.P. had been living with Alyssa for approximately two years, and more than half of her life. She was happy, healthy, and meeting her developmental milestones. Alyssa indicated she wanted to adopt M.P. and M.P. indicated she wanted her forever home to be with Alyssa. M.P. stated Mother could

14

visit, when prompted by the social worker, but did not express a desire for Mother to live in her permanent home with her.[3]

Accordingly, the Agency concluded the benefits of adoption outweighed any possible detriment caused by the severance of Mother's and Father's parental rights. The juvenile court agreed with the Agency's assessment and concluded Mother's relationship with M.P. was not a parental relationship sufficient to thwart the preference for adoption. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Substantial evidence supports the court's finding and the court did not abuse its discretion in determining the relationship did not outweigh the benefits of adoption. (See *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.)

Mother asserts this case is like *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), one of the few cases in which an appellate court has determined the juvenile court should have applied the beneficial parent-child relationship exception to preclude adoption. In *S.B.*, the court noted there were exceptional circumstances, in part because father suffered a medical condition, post-traumatic stress disorder, that was beyond his control but impaired his ability to care for S.B. (*Id.* at p. 294.) Similarly, here, Mother's ability to care for M.P. has been severely affected by a medical condition that is largely beyond her control. However, the parent-child relationship at issue in *S.B.* was dramatically different than the relationship at issue here.

The father in *S.B.* was the primary caregiver to S.B. for three years prior to the dependency case and maintained frequent loving visits with S.B. throughout the case. (*S.B.*, *supra*, 164 Cal.App.4th at p. 298.) As a result,

---

3    Mother asserts M.P. included her in the drawing of the forever home but, consistent with the social worker's description of the discussion surrounding the picture, it appears M.P. drew Mother *outside* the home, along with the other individuals M.P. said could visit.

15

the two shared " 'an emotionally significant relationship.' " (*Ibid*.) During visits, S.B. would sit on her father's lap, ask to be picked up, and whisper and joke with him. (*Ibid*.) She was upset when visits ended, did not want to leave, and told her father she wished she lived with him. (*Ibid*.) An expert conducted a bonding study and indicated the bond between S.B. and her father was "fairly strong". (*Id*. at p. 295.) Although S.B. had a "primary attachment" to her relative caregiver, the court determined severing the bond between S.B. and her father would be greatly detrimental to S.B. (*Id*. at pp. 299-300.)

By contrast here, Mother had a difficult time engaging with M.P. throughout the case, and her visits became shorter and less frequent as the case progressed. When visits did occur, M.P. often refused to participate, walked away, or asked to end the visit early. Mother suggests this was because the visits were primarily over video for the last several months of the case, but it was Mother that chose to continue with video visits. Regardless, even when M.P. did have in-person visits with Mother, Mother would often ignore her and, in one exemplary case, did not make any effort to comfort her when she fell, causing M.P. to turn to another relative instead. Although M.P. referred to Mother as "mommy", she did not express any desire to live with her and, instead, said that she wanted her forever home to be with Alyssa *and no one else*. She agreed that Mother could visit the home, but only upon prompting from the social worker. Accordingly, unlike the situation in *S.B.*, there was no indication M.P. would suffer great detriment as a result of severing the relationship with Mother.

Mother asserts the court cannot rely on the promise of a caregiver to continue visitation, and that, here, the contentious familial relationships suggest continued visitation may not occur. (See *S.B.*, *supra*, 164

16

Cal.App.4th at p. 300.) However, there is no indication the juvenile court relied on the promise of continued visitation in reaching its conclusion. Instead, the court determined Mother's relationship with M.P. did not rise to the level of a beneficial parental relationship, based largely on the lack of engagement that occurred during the visits Mother did have. As discussed, substantial evidence supports the court's conclusion.

In addition, Mother asserts none of the cases the Agency relies upon arise from a situation in which the child became a dependent of the juvenile court due to a situation outside the control of the parent. Similarly, Mother asserts her poor decision making and inability to connect with M.P. were largely the result of her medical condition and, thus, not within her control. While the circumstances of removal may be relevant to the bond the child had with the parent at the outset of the case, the beneficial parent-child relationship exception focuses on the nature and quality of the actual bond that does or does not exist between the parent and child at the time of the section 366.26 hearing. (See *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) As the juvenile court acknowledged, the circumstances of this case are unfortunate, but it nevertheless remains that there was not a beneficial parent-child bond between Mother and M.P. at the time of the section 366.26 hearing that was sufficient to overcome the preference for adoption.

DISPOSITION

The judgment is affirmed.


                                        HUFFMAN, Acting P. J.

WE CONCUR:



HALLER, J.



AARON, J.